## PRELIMINARY STATEMENT

Plaintiff respectfully submits this memorandum in opposition to Defendants' motion to dismiss.  For the reasons stated below, Defendants motion to dismiss should be denied in its entirety.

### Statement of Procedural History

On April 2, 2010, Plaintiff commenced this action by filing a complaint, within the four-month limitation period allowed for certain state claims.  It was amended as of right and filed on July 12, 2010.

Thereafter, on July 23, 2010, Defendants sought permission to move to dismiss on three grounds:  (1) lack of jurisdiction as the parties are subject to arbitration; (2) strike the complaint in its entirety or, at the very least, to the extent that it is redundant pursuant to Rule 12(f) or, failing that, for judgment on the pleadings under Rule 12(c) or dismissal for failure to state a claim under 12 (b)(6).  If dismissal was unavailable, Defendants sought to strike those portions of the complaint that are redundant or immaterial pursuant to Rule 12(f).  After a pre-motion conference, during which the Court noted material in the first amended complaint that could be omitted, the Court entered a Minute Order stating that "Plaintiff has leave to file amended complaint by 10/8/10."Ex.C at MD.[1]

On October 8, 2010, Plaintiff served a second amended complaint (the "Complaint), omitting almost 40 pages of content, and reducing the claims pled by four.  By Electronic mail of November 10, 2010, Defendants served Plaintiff with a courtesy copy of the motion to dismiss, the orginal of which arrived by mail later.

---

[1] "MD" refers to Defendants' memorandum of law and accompanying exhibits filed with the Motion to Dismiss dated November 8, 2010.  "Ex. __ to MD refers to the exhibits in the Silverman declaration attached thereto.

**Allegations of the Complaint**

In 1981, Plaintiff commenced employment with the District as a Special Education Teacher and continued in that position for 19 years.  C119.[2]  In 1999, Plaintiff competed for, and was awarded a scholarship from the District and Fordham University to attend a Masters Program in Educational Administration, marking the District's commitment to develop Plaintiff as an administrator.  C128.  In 2000, Plaintiff competed for, and was awarded, the position of Assistant Principal and was later granted tenure as Assistant Principal on August 15, 2004. C130.  By resolution dated September 26, 2006, Plaintiff was appointed Principal at Temple Hill Academy ("THA"), the first female Principal in the history of THA. C133;136.  Her responsibilities at THA began as a legal and factual matter on that date. C409, 265.   During her entire career in District, including her entire term as principal, Plaintiff was rated competent or above in every rating period, and in every rating component, save one – and that single rating component is a subject of this lawsuit. C122-23;138-140.  Significantly, in or about March 2009, she was recommended for tenure by Assistant Superintendent ("AS") Marsha Sobel, her direct supervisor, a recommendation that, had past custom and practice in the District been observed, and District tenure review procedures been followed, would have resulted in tenure for Plaintiff. C3; 170-73.  Ms. Sobel continued to support Plaintiff through the summer of 2009 after the District commenced efforts to build a pretextual record for dismissal. C3,197,225.

For some time, at least as far back as 2006, the District has had a policy to increase minority representation at all levels of the professional staff.  C309.  Denominated as either a policy to increase minority representation by a fixed percentage, or to match the demographics of the students with that of the professional staff, the District had an unlawful policy and practice of

---

[2] Citations to "C__" are to the Second Amended Complaint dated October 8, 2010 and corresponding paragraph number.

using race as a factor in employment decisions.  C41-44.  This policy was only achieved by applying different standards for minority administrators and relying on race as a factor in personnel decisions.  C4, 42-43,322-23,328.  As a result of the implementation of the policy, minority representation increased in the District.  C4, 44.  Reflective of the mindset of some policymakers in the District, the Chair of the District's Diversity Recruitment Committee ("Diversity Committee") and Personnel Committee was heard to inquire, in a school administered by a white principal but predominately comprised of minority students, why a black principal was not administering the school. C312.  In March 2007, Runston Lewis, an African American and the then-Board President, met community leaders.  He said in a room filled with leaders from the minority community, the Superintendent and other officials:  "what we need is someone who looks like us out there," referring to school administered by a white principal, and went on to discuss the need for more minority administrators in the District who reflect the racial composition of the student body.  C314.  This was not the first or last such meeting, or public conversation, where the community called for more minority representation in the professional ranks in the District.  C313-14.  Attaining that goal became a political imperative for certain board members and Mr. Lewis conceded as much under oath in another proceeding, where he said his charge "was to employ more African-Americans in higher positions in the educational system."  C314-15.  In the 2008-09 academic year, the District was comprised of  30% black students; 39% Hispanic/latino students; 28% white students.  C28.

Also, for some time, the District had a policy of placing only males in certain District Schools on the belief those schools needed strong male role models.  C336.  In addition, the District exercised a series of personnel actions with respect to women only, that had the purpose and effect of treating women differently than men, including requiring women, but not men, to

sign tenure extension agreements (or "*Juul* Agreements") under threat of termination, effectively creating a four-year tenure track for women.  C381.  Administrative leave, a status not officially recognized in the District, was only applied to women.  C263.

Sometime in early 2009, efforts began to develop pretextual reasons to terminate Plaintiff.  At or about that time, a number of events occurred that Plaintiff alleges triggered the unlawful actions of one or more Board members and District officials.  First, the District continued to pursue a policy of race norming the professional staff by applying different standards for minorities and nonminorities, a practice that had been ongoing for some time, particularly during the tenure of Runston Lewis as Board President and Grace Bowles' tenure as Chairperson of the Diversity Committee and Personnel Committee – the committee before which personnel decisions in the District ultimately are reviewed prior to consideration by the full Board.  C33-34.  Next, Plaintiff, in coordination with her direct superior, AS Sobel, and the District Human Resources Assistant Superintendent ("HR AS"), Mary Ellen Leimer, began to take steps to address the negative performance of an Assistant Principal ("AP"), Laura Bair, a personal friend of certain Board member(s) and a member of the District's Diversity Committee.  C58,142-144.  Finally, Plaintiff was encouraged to take on entrenched and obstructive teachers at THA (and by implication, their union), whose negative influence was affecting children's educational outcomes.  C161-64.

At or around the same time, certain Board members, including Ms. Bowles and Stephen DeMarco -- a close friend of Ms. Bair, and formerly a District teacher who had had a funding request for educational programs that would benefit financially he or his wife voted down by Plaintiff in her capacity as union representative to the Policy Committee in 2006--C53-55,58, began visiting THA unannounced and without proper authorization of the Board, pulling

teachers from their classrooms, leaving children unattended and making inquiries about Plaintiff's performance.  C48; C145-151.  Sometime thereafter, as a result of complaints from his members, Ed Mucci, the husband of Plaintiff, and President of the union, who was charged with stewarding the full scope of labor activities on behalf of administrators in the District, wrote to Mr. Lewis, the then-Board President and complained of such visits to District schools as violating law and District policy.  C153; Ex P to MD.

In March 2009, certain issues arose during the state assessment exams, the administration of which had been the responsibility of Ms. Bair since 2007.  C174-188.  As a result, in May 2009, Plaintiff and her administrative team were directed by Dr. Saturnelli to prepare a document outlining the testing protocol.[3]  C187.  In Spring 2009, Ms. Bair had already informed another district administrator that Plaintiff would be placed on an Educator Improvement Plan ("EIP"). Similarly, employees were discussing that Plaintiff would not be granted tenure and would be fired – months before the putative reasons for termination were manufactured.  C189-194.  Only after certain District employees had publicly discussed the actions that would ultimately be taken against her, Plaintiff was notified that Dr. Saturnelli would be placing her on an EIP, requiring Plaintiff to prepare the Assessment Manual. C189,198.  Plaintiff was told that it would not affect her tenure if it was completed by October 1, 2009.  C199.  No educator had ever been placed on an EIP in like circumstances, and usage of an EIP in these circumstances violated District policy. C201.  While both HR AS Leimer and AS Sobel objected to Plaintiff's placement on the program, it was the understanding of Plaintiff, Ms. Leimer and AS Sobel that Plaintiff would be granted tenure upon completion of the EIP.  C203, 213.  Thereafter, notwithstanding that

---

[3] Ms. Sobel, as representative of the District, endorsed Mrs. Mucci's procedures regarding the administration of assessment exams in a previous evaluation: "Mrs. Mucci provides a serious assessment environment to promote proper administration of all NYS assessments."

understanding, Plaintiff was directed to sign a *Juul* agreement -— a vehicle that is designed to give the District an extra year to observe an administrator before making tenure decisions and to give the administrator an extra year to prove her entitlement to tenure -- or be terminated even though the District lacked any "just cause" to extend her tenure and had no formal authorization of the Board to threaten firing.  C204-09.  At the time the agreement was executed, Plaintiff was told that she would be granted tenure; she was not told that the District had no intention of retaining her in the District. C212,213.  The agreement itself promised a decision regarding the conferral of tenure, and all associated rights, yet there is no evidence the District actually provided the process before terminating Plaintiff.  C423,428; Ex.F to MD.  Dr. Saturnelli ordered all of these adverse actions at the direction of one or more of the Board members in excess of the Board's and its constituent member's lawful authority under state law, and in violation of past custom and practice in the District that dictated that observations and evaluations, and the AS's recommendation were the principal authoritative sources for tenure decisions. C226,171.

Upon the opening of school in September 2009, certain District officials endeavored to manufacture pretext to terminate Plaintiff, notwithstanding that they had signed an agreement the effect of which was to afford Plaintiff an extra year to demonstrate her entitlement to tenure. C229-259.  First, AS Sobel, was told to stay away from THA so that she would be unable to observe attempts to develop pretext against Plaintiff. C232-33.  Next, Mike McLymore, Executive Director of Human Resources, made unannounced visits to THA to question staff about Plaintiff. C229-30.  On September 24, a date that Plaintiff was supposed to be attending an outside conference, BOE members Bowles, DeMarco and McAfee descended on THA to manufacture cause. C234-41.  Dr. Saturnelli visited THA that same day and was observed visiting classrooms and exiting with a folder of unknown contents provided by a teacher. C241.

Plaintiff was summoned before administrators within days and confronted in a hostile manner with a myriad of purported issues at THA. C242-251.

On October 15, 2009, Dr. Saturnelli advised Plaintiff that she was being placed on administrative leave, a status that does not exist in the District, and was told that she was not to be present on school grounds, and that she had to surrender her District identification and keys. C262-63. If you credit the District's account, these actions were taken without Board approval.[4] On or about October 16, 2009, Roberto Cruz, an untenured AP of Hispanic descent in the District replaced Mrs. Mucci as principal. The position was not posted in violation of District policies and procedures and there was not a competitive process to fill it. C326. THA is one of the District schools with the highest percentage of Hispanic students. C266. On October 20, 2009, as required by law, the District identified the three reasons for Plaintiff's termination:

> 1. Failure to have all teacher schedules for Temple Hill Academy completed and distributed by September 1, 2009.
>
> 2. Failure to have staff duty schedules for Temple Hill Academy completed and distributed by September 1, 2009. This led to significant student supervision issues in the hallways and cafeteria during the month of September 2009.
>
> 3. Failure to timely report student physical altercations at Temple Hill Academy that occurred during the month of September 2009.

Each reason cited was factually inaccurate. The cited reasons had never formed the basis for a dismissal in the District, and were patently pretextual, designed to hide the District's unlawful purpose. No male had ever suffered employment consequences for scheduling issues. C272-73.

Maritza Ramos, an Hispanic female had been recommended for tenure by AS Sobel at the same time as Plaintiff, was granted tenure in 2009. C322. Similarly, Laura Bair, also of

---

[4] Plaintiff alleges an unlawful meeting of the Board occurred the night before, October 14, which was posted at the District website and later disappeared, to unlawfully authorize termination. C260-61.

Hispanic descent, who was directly responsible for the administration of the Assessments at THA in 2009, and had history of poor performance issues in the District, was recommended for tenure.  C323.

Among the myriad of unlawful and outrageous actions undertaken by the District was its conducting a criminal records check by running the fingerprints of Plaintiff through a state databank after she was terminated and after a notice of claim was filed in this action in an effort, Plaintiff alleges, to try to find another basis for termination.  C302-03.  That same practice was the subject of another action pending in this Court, which appears headed for trial, where an administrator testified that Dr Saturnelli ordered him to conduct a similar check on another terminated administrator in an effort to justify the termination.  C304.  *See Ragin v. Newburgh Enlarged City School District*, 2009 U.S. Dist. LEXIS 118704 (S.D.N.Y. 2009).

## ARGUMENT

### I.    THE COMPLAINT COMPORTS WITH THE FEDERAL RULES

Citing only an alleged "exhaustive" discussion of the individual's employment history in the Complaint, and no other specific example of deficiencies to which Plaintiff can respond, Defendants go on to characterize the Complaint as containing a "surfeit of detail," and state in conclusory fashion: "the factual allegations presented [sic] in very little semblance or order, rely on hearsay or hearsay within hearsay,[5] unfounded accusations, conclusory statements, and interpretations of New York State law." MD at 10.  While observing the Complaint has been reduced by "approximately forty pages and four causes of action," Defendants assert, without

---

[5]    While Defendants do not cite the alleged hearsay to which they refer, and while it is premature to make evidentiary determinations with respect to facts pled, it is likely that much of what is being referenced is either not hearsay, including prior statements of a likely witness or an admission by a party opponent, *see* Fed R. Evid. 801, or falls into an exception to the hearsay rule.  *See* Fed R. Evid. 803.

citing any authority, that an eighty-five page complaint with 26 claims is presumptively prolix, defective and worthy of nothing short of dismissal without leave to amend." *Id.*   In the alternative, they ask that the Court strike those portions "that are redundant and/or impermissibly plead [sic] pursuant to 12(f).[6] *Id.*   In seeming incongruent fashion, starting just pages later and liberally sprinkled throughout the motion, Defendants contend that certain claims should be dismissed for alleged conclusory allegations.  MD11,12, 30, 32, 34, 41.

"The principal function" of Rule 8(a) (2)'s short, plain statement requirement "showing that the pleader is entitled to relief" is to provide defendant with "fair notice of the claim asserted so as to enable him [or her] to answer and prepare for trial."  *Sallahudin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *see also Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) ("a plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what plaintiff is complaining about and to know whether there is a legal basis for recovery'"). "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial."  *See Simmons v. Abruzzo*, 49 F. 3d 83, 86 (2d Cir. 1995) (*quoting* 2A *Moore's Federal Practice* P 8.13, at 8-58 (2d ed. 1994)); *see also Wynder* v. *McMahon*, 360 F.3d 73, 79 (2d Cir. 2004)("key" to Rule 8(a) is adequate notice.  A complaint fails to comply with this rule "if it is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised."  *See Strunk v. US House of Representatives*, 68 Fed. App'x 233, 235 (2d Cir.

---

[6]      Striking a party's pleadings, however, "is an extreme measure," and motions to strike under Rule 12(f) "are viewed with disfavor and infrequently granted." *See Stanbury Law Firm, P.A., v. Internal Revenue Service,* 221 F.3d 1059, 1063 (8th Cir. 2000). (quotation omitted)

2003).[7]  No matter its length or form, no complaint should be dismissed unless it is frivolous.[8]
*See Simmons*, 49 F. 3d at 87 (2d Cir 1995).

Here, there is little question that the Complaint gives more than fair notice to the Defendants of the claim.  The action is, in essence, one for wrongful termination, grounded in a number of separate and clearly enumerated claims for relief in language that, far from being unintelligible, is plain and simple. The Complaint is laid out in typical and logical fashion with a statement of jurisdiction, followed by parties, levels of culpability of each party, facts common to the multiple claims, and then the claims followed by the Prayer for relief.  Perhaps the best indication that Defendants have fair notice of the claims is the Motion to Dismiss which seeks to dismiss each and every claim and evinces a largely complete appreciation of the claims pending against Defendants.  Plaintiff's opposition, as well as discovery and pre-trial proceedings, will serve to further clarify the issues to be tried, as contemplated by the Federal Rules.  *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512-13 (2002); *Wynder*, 360 F.3d at 77 n.6.

Distilled of hyperbole, Defendants' principal contention centers on the length of the Complaint.  *Compare In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) (Defendants' motion to dismiss asserting that, at 368 pages and 1,249 paragraphs, plaintiff's complaint was too long and confusing, was denied because although complaint was lengthy, it did not overwhelm defendants' ability to understand or to mount defense); *In re Global Crossing, Ltd. Sec. Litig.* 313 F Supp 2d 189, 212  (S.D.N.Y. 2003)(court refuses to dismiss plaintiff's 326

---

[7]      "Rule 8 does not require a short and plain complaint but rather a short and plain statement of the claim." *Ciralsky v. CIA*, 355 F.3d 661, 670 (D.C. 2004) (citations and quotations omitted). Moreover, it is each averment of a pleading that shall be simple, concise and direct, -- not each pleading itself.  *Simmons,* 49 F. 3d at 87; *see also Ciralsky*, 355 F.3d at 670 (citations and quotations omitted).

[8]      The fundamental command of the Federal Rules is "never to exalt form over substance." *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005).  See Rule 8(e) & (f).

page, 840 paragraph complaint, which erred on side of detail and prolixity in effort to explain

common facts from which their claims emerged).  The length of the Complaint is driven in large

measure by circumstances unique to this case:  there are 16 named defendants; 26 claims,

including pendent state law claims; the presence of various unlawful motivating factors that may

explain why Plaintiff, who was recommended for tenure by her direct supervising

Superintendent, after 28 years of stellar service to the District, was not granted tenure – the

presence of these factors calls for pleading in the alternative[9]; the presence of a fraud count

which requires pleading with particularity;[10] the issue of whether the discriminatory policies

were implemented and effected in furtherance of a District interest, albeit unlawful, or out of a

personal interest, beyond the scope of employment, which suggests pleading a conspiracy with a

state actor; the existence of varying levels of alleged culpability among Defendants; a federal

claim that is grounded in the existence of a property interest which hinges on a determination of

state law; the appending of 18 state claims, all of which are inextricably interrelated to the

federal claims and the violation of which, along with District policies and procedures, are

reflective of discriminatory intent behind Defendants' actions -- a critical issue in many of the

federal claims and one disputed on this motion; the presence of a pendent Article 78 claim which

challenges the District's actions as arbitrary and capricious, an abuse of discretion or in excess of

the law, raising various additional grounds for relief, requiring different factual allegations.

While the claims pled are many, they can and should be considered in the context of a single

proceeding.  *See infra* at pp 35-36.  Viewed differently, the Complaint amounts to a little over

three pages per claim; in the context of the above circumstances and the prism through which the

---

[9]        "A party may state as many separate claims and defenses as it has, regardless of
consistency."  Fed. R. Civ. P. 8(d)(3).  *Manhattan Fuel Co. v New England Petroleum Corp.,*
422 F. Supp. 797, 802 (S.D.N.Y. 1976), *aff'd* 578 F.2d 1368 (2d Cir. 1978).
[10]        Fed. R. Civ. P. 9(b).

issues should be adjudged, the complaint length is not unreasonable.  *See, e.g., Ciralsky*, 355 F3d at 670 (D.C. 2004) (pre-*Iqbal* court upheld refusal to dismiss complaint which averaged two pages per claim).

Finally, in the wake of *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic* v. *Twombly*, 550 U.S. 544 (2007) where a court must determine whether a claim is plausible and is encouraged to rely on common sense and judicial experience, plaintiffs are placed in a tenuous position of pleading too little at her or his own peril.  *See, e,g,* Miller 60 Duke L.J. 1, 18 (2010) (new standard in effect establishes an earlier point for disposal of an action, creating "life-or-death significance" for plaintiffs) *Id.* at 22 ("plausibility pleading [has] undone the relative simplicity of the Rule 8 pleading regime and the limited function of the Rule 12(b)(6)").  This concern is borne out in the instant motion where, among other examples, Defendants invite the Court to wade into questions, presumably as part of the plausibility inquiry, such as why a Board comprised of mostly Caucasians would vote unanimously to terminate Plaintiff.  While some courts and commentators express the view that the standard has not changed under Rule 12(b)(6), a database search of cases dismissed  by a court citing *Twombley and Iqbal* reveals how dramatically practice has changed locally and elsewhere.  *See also id. at 25 nn. 89-90.*

## II.   ALL OF PLAINTIFF'S CLAIMS ARE PLAUSIBLE,  AMPLY SUPPORTED BY FACTUAL ALLEGATIONS, AND STATE  VIABLE CLAIMS

On a motion to dismiss under  Rule 12(b)(6), the Court accepts as true all factual allegations  in the complaint and draws all reasonable inferences in the plaintiff's favor.  *Ferring B.V. v. Meijer, Inc.*(*In re DDAVP Direct Purchaser Antitrust Litigation*), 585 F.3d 677, 692 (2d Cir. 2009), *cert. denied,* 130 S. Ct. 3505 (2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (quotations and citations omitted).  "[A]ctual allegations

must be enough to raise a right to relief above a speculative level." *See Twombly*, 550 U.S. at 555; *see also Arista Records LLC v. Doe*, 604 F.3d 110, at 119, 120 (2d Cir. 2010) (confirming the continuing validity of *Sweirkeiwcz v. Sorema N.A.*, 534 U.S. 506, 508, 512 (2002))**.**  At the pleading stage in the employment discrimination context, a plaintiff need only allege facts that provide fair notice of the claim and are not required to allege specific facts establishing a prima facie case.  *See Sweirkeiwcz,* 534 U.S. at 508, 512 (2002).

Applying the above standards to Plaintiff's Second Amended Complaint, Plaintiff has adequately stated claims upon which relief can be granted.

### A.    Plaintiff Has Adequately Pled Race and Gender Claims

Defendants  raise various challenges to the claims of race and gender discrimination. *See* MD14-21. Claims 1, and 10 (race); Claims 2, and  9 (gender).[11]

### 1.    Discriminatory Intent Grounded in Race and Gender

According to the Complaint, the District had a de facto policy of setting aside certain positions in the administrative ranks for minorities and applying different standards to minority and non-minority administrators.  These policies, which were implemented or continued by the Chair of the Personnel Committee and Diversity Committee, and ratified by the Board, resulted in Plaintiff's removal and termination. C309-329.

Racial distinctions, the Supreme Court has held, are "inherently suspect and call for the most exacting judicial examination." *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274  (1986) (citation omitted).  Racial classifications must be justified by a compelling governmental interest

---

[11] None of the Claims pled is denominated as a "Class-of-One" claim under § 1983, and Plaintiff has not advanced such a claim. Accordingly, Plaintiff will not respond to that part of Defendants' Motion to Dismiss.

and the means chosen to effectuate the purpose must be narrowly tailored to achieve that goal.[12]
*Id.* at 274.  The challenged action must fall unless the Court concludes that the action was necessary and justified by a purpose to remedy past discrimination.  *Id.* at 277.  The Supreme Court has emphasized that this is a high hurdle. *Id. at* 277; *Ricci v. DeStefano,* 129 S. Ct. 2658 (2009); *Kubicek v. Westchester County*, 2009 U.S. Dist. LEXIS 117061 at 35-36 (S.D.N.Y 2009).  Indeed, the role model theory advocated by certain Board members holding leadership positions during relevant times (*see* C309,311, 314) has been specifically rejected by the Court. *Wygant,* 476 U.S. at 275-76.  And, while discrimination in hiring creates a diffuse burden, a layoff or termination imposes the entire burden of achieving racial balancing on particular individuals and is "too intrusive" and should be closely scrutinized.  *See id.* at 283.

Here, Plaintiff has alleged that, as part of a District policy, race was a motivating factor in her termination. C331.   On a motion to dismiss, that is the end of the inquiry. *Trans World Airlines, Inc.* v. *Thurston,* 469 U.S. 111, 121 (1985) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination").

Even assuming Plaintiff is obligated to satisfy the standard articulated in  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) on a motion to dismiss, as Defendants suggest (MD14-16), Plaintiff has adequately satisfied the pleading requirements at this stage.[13] *See*

---

[12] While the standard applied in gender discrimination cases differs from that applied in cases involving race, *see Johnson v. Transportation Agency*, 480 U.S. 616 (1987), a District action that assumes a male can provide a stronger role model than a woman and, based on that assumption, replaces a female principal, cannot survive scrutiny.  C336.

[13] Section 1981 claims based on employment discrimination, and employment discrimination claims under the New York State Human Rights Law are analyzed under the same standards used for Title VII claims. See *Russell v. County of Nassau*, 696 F. Supp. 2d 213, 231 (E.D.N.Y. 2010).  For the same reasons stated with respect to §1983, Plaintiff has adequately pled the State Human Rights Claims.

*Sweirkeiwcz,* 534 U.S. at 509-514.  To plead a *prima facie* case under *McDonnell Douglas, 411 U.S. 8028-04,* Plaintiff must show (1) she was a member of the protected class; (2) she was qualified for the job in question; (3) the employer took an adverse employment action against her; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.[14]

While unclear if Defendants are challenging whether plaintiff was "qualified" under the second element, we address that question here.  To satisfy this prong, even at the summary judgment stage, Plaintiff need not allege that she demonstrated "perfect performance or even average performance, but only that she possesses the basic skills necessary for the performance of the job." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (citation omitted).   Here, Plaintiff competently served the District for 28 years, C121-123; attained the necessary educational degree, C128; performed ably in the position of assistant principal, C130-131; performed competently as principal, C140,141,162, 169, 197; and was ultimately recommended for tenure by the AS Sobel who evaluated and observed Plaintiff during her service as principal. C169.  The fact that she was appointed to the position in the first place evidences at least the minimum qualifications to satisfy this prong.  *Id.* at 696.

Finally, Plaintiff has adequately pled facts that show Defendants' actions and inactions were animated by discriminatory intent or were otherwise laden with an inference of discrimination.  First, as discussed above, the District policy purposefully relied upon race as a factor, attempting to increase the minority representation by a certain percentage and to mirror the racial composition of its students.  *See Wygant,* 476 U.S. 267.  Second, among the

---

[14] While Defendants do not dispute that Plaintiff was in a protected class or that she has suffered an adverse employment action, she has adequately pled those elements.  See C8; C300.

circumstances from which an inference of discrimination may be derived is the replacement of plaintiff by someone outside the protected group, s*ee Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)*(citations omitted) (holding that "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination); invidious comments about others in the employee's protected group; more favorable treatment of employees not in the protected group; and the sequence of events leading to the plaintiff's discharge. *See Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009)*(citations and quotations omitted).  Plaintiff's alleges each of the above circumstances.  *See* C326 (replaced by a male Hispanic creating inference of discrimination as to both her race and gender claims); C312,314 (invidious comments about others in her protected group, one of whom was ultimately removed under like circumstances; *see also; Tomassi v. Insignia Fin. Group, Inc*., 478 F.3d 111, 116 (2d Cir. 2007)); C276, 288, 323 (more favorable treatment of male probationary principals, and minority administrator candidates);  C322 (less favorable treatment when compared to a minority candidate who also received a recommendation for tenure at the same time as Plaintiff).   Finally, Plaintiff  adequately detailed a series of suspect events leading up to her termination, including the violation of many well established laws and District policies.  C146-48,198,213,214,219,220,228-254.[15]

### 2.   <u>Disparate Impact</u>

Plaintiff  has sufficiently satisfied her pleading burden on the disparate impact claim (Claim 8). In *Jenkins v. New York City Transit Auth*., 646 F. Supp. 2d 464 (S.D.N.Y. 2009) the

---

[15]Defendants' analysis of the reasons advanced for the adverse employment action and whether they were pretextual (MD 15,16,20) should not be considered at this procedural phase of the case. *Hemans v. Long Island Jewish Med. Ctr*., 2010 U.S. Dist. LEXIS 115215 (E.D.N.Y. 2010) (citation omitted); s*ee also Swierkiewicz*, 534 U.S. at 510 ("The *prima facie* case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement").

court held that in a disparate impact claim, plaintiff must identify a specific employment practice to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Id.* at 469. Contrary to Defendants' assertions, Plaintiff need not present statistical evidence at this juncture, prior to discovery. *See Jenkins*, 646 F. Supp. 2d at 469.

Here, Plaintiff  has alleged that there is a significant disparity between the number of female and male employees required to sign tenure extension agreements – a specific employment practice --with the effect being that a significant number of females have a four-year probationary period while men have a three-year period. C380-381; *see also* differences in Admin Leave, C263,288. The policy has been applied in a statistically significant manner to female administrators and that such actions have had an adverse impact on that protected class of employees. C377-384. The same has been alleged with respect to administrative leave. C263. Having satisfied the pleading burden as to this claim, Defendants' motion to dismiss should be denied.

### 3.     Plaintiff Has Adequately Pled a § 1981 Violation

According to Defendants, because there was no discrimination against Plaintiff, the requisite, causal link between the Defendants and the employment actions cannot be established under § 1981. As stated above, Plaintiff has pled countless allegations, detailing the discriminatory treatment of Plaintiff and the personal involvement of all Defendants, sufficient to satisfy her burden. *See  Stevens v. New York*, 691 F. Supp. 2d 392, 401 (S.D.N.Y. 2009).

### B.          Plaintiff Has Stated a Due Process Claim

To state a claim for denial of the right of procedural due process under § 1983, Plaintiff must allege that a protected property interest was infringed by a challenged state action without providing process.  *See Gipson v. Hempstead Union Free Sch. Dist*., 2010 U.S. Dist. LEXIS

123719 at 8 (E.D.N.Y. 2009). Property interests are a species of state law, *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Public school employees have a property interest in their position under New York State law and are entitled to process <u>before</u> they can be deprived of that interest. *See DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 789 (2d Cir. 1999) (citation omitted, emphasis added).

Defendants do not take issue with the premise that one who obtains tenure under New York Law, whether pursuant to the statutory process or by estoppel, is possessed of a property interest. MD 22-24. Nor do they dispute that, if a Plaintiff is deprived of that interest without due process, then she "may prevail in an action based on the Due Process Clause." *See* MD 22. Defendants' instead assert that Plaintiff was terminated during the course of her three-year probationary period, presupposing that her probationary period had been extended for one year pursuant to the *Juul* agreement. Therefore, defendants contend, Plaintiff had effectively received all the process to which she was entitled. MD24. Next, relying on matters outside the complaint and inappropriate for consideration under Rule 12(b)(6), Defendants contend that Plaintiff was terminated within three years, irrespective of the existence of a valid *Juul*. Notwithstanding that Plaintiff had assumed principal responsibilities on September 26, 2006[16] and was not removed from the building at THA until October 15, 2009, Defendants contend that a document that purports to be an earnings report establishes "that she remained as the assistant principal until October 13, 2006, and that she began her employment as a probationary principals at THA on

---

[16] Tenure rules should be read broadly in favor of the teacher and that function rather than label should control when a probationary period commences. *Speichler v. Board of Coop. Educ. Servs.*, 90 N.Y.2d 110, 117-118 (1997). "This Court has made clear [that tenure rules] should be read so as to discourage a board's use of technical obstacles and manipulable labels that can deprive a qualified teacher of tenure rights. *Id*. (citations omitted).

October 16, 2006."[17]  MD24.  Finally, Defendant raises certain ancillary issues about statutory

notice periods.  MD22-23.  Those issues are addressed *infra* at pages 37-38.

It is well recognized that, "[t]enure may be acquired by estoppel when a school board

accepts the continued services of a teacher or administrator, but fails to take the action required

by law to either grant or deny tenure prior to the expiration of the [educator's] probationary

term."  *McManus v. Bd. of Educ.*, 87 N.Y.2d 183, 187 (1995).  The question that must be

answered is whether the person performed services of the position in excess of three years, not

whether she held an official title or other accoutrements of the position.   *See id*. at 189-190; *see*

*Orshan v. Anker*, 489 F. Supp. 820, 825 (E.D.N.Y. 1980) (holding that tenure gained through

estoppel will be sustained if the employee has rendered actual service beyond the probationary

term) (citations omitted); *Maras v Board of Educ*., 275 A.D. 2d 551 (3d Dep't 2000)( same).

Plaintiff alleges that on or about September 26, 2006, the Board voted to approve her

appointment as Probationary Principal at THA in the elementary principal tenure area to serve a

(3) year probationary term, C133, and that "by operation of law and as a factual matter," she

began her probationary period on that date.  C409.  She served in the capacity of Principal in

excess of her three-year probationary term through October 15, 2009, when she was removed

---

[17] Defendants reference an earnings report in an attempt to establish beyond the four corners of
the complaint the effective date of Plaintiff's probationary period. (MD24). However, it is
inappropriate to consider such matter (Ex. L to MD) on a motion to dismiss. On a 12(b)(6)
motion, the court must limit itself to the facts alleged in the complaint; to any documents
attached to the complaint as exhibits or incorporated by reference therein; to matters of which
judicial notice may be taken; or to documents the terms and effect of which the complaint "relies
heavily" and which are, thus, rendered "integral" to the complaint. *Chambers v. Time Warner,
Inc*., 282 F.3d 147, 152 - 153 (2d Cir. 2002)). While Plaintiff is unable at this juncture to confirm
the authenticity of the document, readily apparent is the fact that Plaintiff did not reference the
document, or rely on it in any manner, in the Complaint.  Moreover, even assuming authenticity
and fairly considering its contents, the document does not evidence that Plaintiff was not
performing the duties of principal, but only that she was not being compensated for them.  See p.
19, above.  For those reasons, Defendants' contention must be rejected.

from the building.  C133,138,139,141,222,264,265,342,409-410.  Thereafter, she remained "ready, willing and able" to perform services through the effective date of her termination on January 8, 2010.  C410.  Therefore, based on the plain reading of the allegations in the Complaint, Plaintiff provided services and the District accepted those services for in excess of three years and therefore acquired tenure by estoppel under New York law.[18]

Nevertheless, Defendants contend that Plaintiff agreed to extend her tenure.  An employee "may validly <u>waive his right to tenure</u> and be employed for an additional year without acquiring tenure <u>as a *quid pro quo* for re-evaluation and reconsideration of the tenure determination at the end of the extra year</u>." *Juul v. Bd. of Educ.,* 76 A.D.2d 837,838 (2d Dep't. 1980). (emphasis added).  Whether such waiver will be upheld depends upon the existence of a "bona fide agreement by which the employee received a desired benefit in return for the waiver, the complete absence of duress, coercion or bad faith and the open and knowing nature of the waiver's execution." *American Broadcasting Cos. v. Roberts*, 61 N.Y.2d 244, 249-250 (1984) (citation omitted); *Nabors v. Town of Somers,* 72 A.D.3d 769, 772-73 (2d Dep't 2010).

Plaintiff alleges as a matter of law that a valid and binding *Juul* agreement did not exist here for several reasons.  First, the District had already put in place a plan to terminate Plaintiff well in advance of demanding that she sign the *Juul* agreement.  C465.  Therefore, while affirmatively representing that Plaintiff would be considered for tenure prior to October 15, 2010, *see* Ex. F to MD, the District and certain officials knew full well that she would be terminated instead, as soon as pretextual cause could be identified upon the opening of school in

---

[18] Defendants make much of the statement in the resolution that states "effective date to be determined," but fail to produce any other action of the Board, which retains the ultimate power to appoint to a probationary term, see Educ. Law 2509 (1)(b), as to what date was ultimately determined. The failure to produce such official action suggests none was ever taken.

the Fall and therefore they never intended to afford Plaintiff "the rights that [she] would have

been entitled to pursuant to §§ 2509, 3019-a and 3031", *see* Ex. F to MD.  See C461-470.  By

failing to disclose her imminent future termination, a material fact, and by falsely representing

that she would be considered for tenure fairly pursuant to applicable guidelines, Defendants

fraudulently induced Plaintiff to enter into the Agreement.  C465.  Plaintiff relied on the

statements and was not made aware of the material omissions, all to her detriment.  Had she

understood the true state of affairs, and putting aside that she was forced to surrender her rights

under threat of termination, Plaintiff would not have signed that agreement.  She could have

asserted her right by way of the grievance machinery in the collective bargaining agreement to

dispute whether the District then had "just cause" to extend her probation,[19] or asserted her rights

under Educ. Law 2509, including her right to have been afforded tenure by estoppel because by

the time the tenure extension agreement was signed, they had already failed to comply with

2509's notice provisions.

      Evidencing further bad faith and the District's own doubt as to the validity of the *Juul*

agreement, the District hurriedly removed Plaintiff from the school on October 15, 2009 (the

date the District erroneously believed to mark the end of her probationary period, as addressed

*supra*), C264, despite its assertion that, under the *Juul* Agreement, it had a full year from that

date before a determination on Plaintiff's tenure needed to be decided.  MD24.  The effect of the

removal, under the District's interpretation of Plaintiff's tenure date, is that Plaintiff was not

---

[19] The collective bargaining agreement, which incorporates by reference the Human Resources
Manual, only allows tenure to be extended with "just cause." C205.  "Just cause" is a
disciplinary standard under New York law and requires a determination, rather than an
accusation.  Under Defendants' own view of the case, it did not acquire cause until September
2009, well after Plaintiff was forced to sign the agreement.

given a single day beyond her tenure period to prove her entitlement to tenure as contemplated by the *Juul* Agreement.

Additionally, District officials, at the direction of Dr. Saturnelli, coerced Plaintiff into signing the *Juul* Agreement with false promises and imposed duress, (C216,489), and undue influence on her with threats of termination. The District orally advised Plaintiff, and, indeed, it was Plaintiff understanding of the agreement, that the District would not keep the extension in place if she satisfactorily completed her EIP. C213.  Indeed, the need to complete the EIP was the sole reason offered at the time for the imposition of the *Juul* Agreement.  The fact that it was not lifted upon the presentation of the EIP, a document that is not designed for discipline but for professional growth, clearly evidences the District's bad faith.  At the same time the District was dissembling to encourage Plaintiff to sign, it made clear that if Plaintiff didn't execute the agreement, she would be terminated even though Dr. Saturnelli had no statutory power to terminate Plaintiff without the Board's approval during the tenure period. C216,489.  Such conduct reflects bad faith, duress and coercion that courts have specifically found vitiate both a *Juul* agreement  and other forms of contract.

Similarly, there was an absence of consideration.  The District had not agreed to undertake to perform any obligation or refrain from performing any action**.**  C496.  In other words, under Defendants view of the agreement, Plaintiff purported to waive her right to a tenure decision but she did not receive a benefit in return for the waiver inasmuch as Defendants were permitted to terminate Plaintiff immediately after signing and ultimately did terminate Plaintiff, and even removed her prior to what they thought was the beginning of the extended period of tenure review, marking a wholesale failure of consideration.  Under *Juul* and *American Broadcasting*, and indeed under general principles of contract law, the Agreement was invalid

and must fail.  *See, e.g. Juul,* 76 A.D. 2d at 838 (holding that voluntary waivers are permitted where they are made as a "quid pro quo" for countervailing benefits).  Courts have construed *tenure extension* agreements as providing an additional year of employment in exchange for the employee's agreement to postpone her right to a tenure recommendation.  See *Juul,* 76 A.D.2d at 838.  *See also Prestopnik v. Whelan*, 249 Fed. Appx. 210, 213 at n. 2 (2d Cir. 2007) (observing that a tenure extension agreement <u>guarantees</u> the employee another year of employment in the school district) (emphasis added).   Here, even under Defendants' view that a valid *Juul* Agreement was in effect beginning on October 16, the District removed  Plaintiff  from THA the day before her extended probationary period was to begin, frustrating the purpose of the agreement.  As Plaintiff alleged, the *Juul* agreement did nothing more than provide the District extra time to fabricate reasons for Plaintiff's termination. C466.

Not only do the above acts evidence an absence of consideration, the District's failure to observe and evaluate Plaintiff and to afford her the tenure process guaranteed by statute and District policy, as well as its failure to employ Plaintiff an additional year in probationary status, constitute a breach of contract, invalidating the agreement under *Juul* and its progeny and under general principles of contract law.  Ex. F of MD. C471-480.  *See Prestopnik v. Whelan*, 249 Fed. Appx. at 21.  As Plaintiff has alleged that she did not an openly and knowingly waive her rights prior to execution, the *Juul* Agreement was invalid and Plaintiff maintained all her tenure rights pursuant to Education Law and thereby secured tenure by estoppel.[20]

Simply stated, Plaintiff alleges that she began working in the position of Principal on September 26, 2006, and acquired tenure by estoppel (Claim 13) when she worked beyond her three-year anniversary through October 15, 2009 (remaining ready to perform service through

---

[20] For the same reason the agreement itself is invalid, the purported date indicated for tenure – October 15 – is also invalid. Ex __ to MD.

the effective date of her termination on January 8, 2010), and the alleged *Juul* Agreement that purported to extend her tenure period and waive her entitlement to the process due her under state law was invalid inasmuch as the agreement was procured through fraud, coercion, duress and undue influence.  In addition, the agreement was not supported by any consideration and it was breached by Defendants, rendering it unenforceable.  (Claims 21 – 25).  Since the District denied Plaintiff a pre-termination hearing afforded tenured employees under Educ. Law § 3020(a) (Claim 14),[21] Defendants have violated Plaintiff's right to due process under federal law, Claim 3.  Based on the foregoing, Defendants' motion to dismiss those claims should be denied.

## C.   Plaintiff's First Amendment Claims Are Well Pled

To survive a motion to dismiss a *First Amendment* retaliation claim, a plaintiff must demonstrate that: "(1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision."[22] *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006).

In determining whether Plaintiff's speech was constitutionally protected, courts begin their analysis by asking "whether the employee spoke as a citizen on a matter of public concern."  *Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009) (citation omitted).  "Generally, the *First Amendment* protects any matter of political, social or other concern to the community." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158,163-164 (2d. Cir 2006) (*citing*

---

[21] Plaintiff's pendent state law claim (Claim 14) alleges a violation of Educ. Law § 3020(a) – the underlying predicate for her Due Process Claim (Claim 3).  For the reasons cited that Plaintiff's Due Process Claim should not be dismissed, Plaintiff's Claim 14 should also not be dismissed.
[22] Defendants erroneously assert that to state a claim for *First Amendment* retaliation, plaintiff must show that the adverse action "chilled" the exercise of plaintiff's exercise of free speech. See *Agostino v. Simpson*, 2008 U.S. Dist. LEXIS 93094 at 20 (S.D.N.Y. 2008) *citing Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

*Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).  In the education context, when speech explicitly concerns events or circumstances that pose a safety risk to students rather than the workplace conditions of the plaintiff, that speech is protected.  *See, e.g., Cioffi*, 444 F.3d at 167 (high school athletic director's speech regarding sexual assault of student was constitutionally protected); *Morey v. Somers Cent. Sch. Dist*., No. 06-CV-1877, 2007 U.S. Dist. LEXIS 20265, at 29-30 (S.D.N.Y. 2007) (head custodian's speech to supervisor regarding asbestos in school gym was constitutionally protected).  While putting a priority on speech concerning safety issues, the Second Circuit also recognized that where, as here, a public employee's speech concerns a government agency's breach of the public trust - and the speech relates to more than a mere personal grievance - that speech is protected.  *Anderson v. New York*, 614 F. Supp. 2d 404, 428 (S.D.N.Y. 2009) (citation omitted).[23]

Here, Plaintiff alleges that, speaking as a private citizen and having no obligation to do so, at a meeting attended by District principals and other District officials, *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), , she raised concerns regarding unannounced, unauthorized and unlawful building walkthroughs by certain Board members, an issue having broad implications in the District plagued by violence and poor performance, C151-52, 352,353, *Anderson,* 614 F. Supp. 2d at 428.  The Board members removed teachers from active classroom instruction without a legitimate purpose and without the required board approval, usurping the lawful function of the Superintendent and her reports. C151,152; Ex P to MD.  The Defendants' actions disrupted the learning process and left students unsupervised thus creating safety concerns. C353; *Cioffi*, 444 F.3d at 167.  Unlike *Garcetti*, 547 U.S. at 417 (2006)., Plaintiff had no

---

[23] *See Skehan,* 465 F.3d 96 at 106("Plaintiff's speech plainly concerned issues of public concern: misfeasance within the police department and allegations of an ongoing cover-up and an attempt to silence those who spoke out against it"), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

obligation to speak about Board member misconduct and the issue had implications District

wide.  Based on the foregoing, Plaintiff has met the requirements of the first prong.

Trying to shoehorn the facts of this case into the issues implicated in cited case law,

Defendants contend that that the issue "appears to be personal" to Plaintiff.  MD at 27.  But Ed

Mucci's letter to the administration reveals that, rather than an isolated incident, the issue

concerned "members of NSAA" and had occurred "over [a]several month[]" period.  Ex. P to

MD.  Similarly, Plaintiff's actions are distinguishable from those in *Weintraub v. Bd of Educ.,*

593 F.3d 196 (2d Cir. 2010), inasmuch as plaintiff there was raising a grievance of a parochial

nature about a supervisor's failure to discipline a student in plaintiff's classroom.  As indicated,

Plaintiff here has raised an issue of District-wide importance, involving unlawful actions of

government officials, with significant potential ramifications.  Because the issue affected every

administrator in the District, including the Plaintiff, and Plaintiff is alleged to have had a

personal interest, does not alter the determination that Plaintiff acted as a citizen on a matter of

public concern. *See Dingle v. City of New York*, 2010 U.S. Dist. LEXIS 76431 at 30-32

(S.D.N.Y. 2010) (finding speech that implicated public safety even though speaker had personal

interest and defendant asserted that his speech was in furtherance of his job responsibilities).[24]

Moreover, the determination of whether Plaintiff spoke pursuant to an official duty is premature

at this juncture. *See Kelly v. Huntington Union Free Sch. Dist*., 675 F. Supp. 2d 283, 293 n. 5

(E.D.N.Y. 2009).

Additionally, Defendants assert that Plaintiff has failed to allege the necessary temporal

proximity between Plaintiff's speech and the adverse actions to establish causation. MD29-30. In

---

[24] *See Gangadeen v. City of New York*, 654 F. Supp. 2d 169,183 (S.D.N.Y. 2009)( "Mixed
motivations are involved in most actions we perform every day; we will not hold plaintiffs to
herculean standards of purity of thought and speech.").

this circuit, a lapse of as many as eight months or more is sufficient to establish temporal proximity.  *See, e.g., Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 555 (2d Cir. 2001) (five months short enough for causal connection); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship).  Plaintiff alleges that not long after she raised concerns regarding the February walkthroughs by certain board members (C352), followed thereafter by a letter dated March 3, 2009 from union president Ed Mucci to the then-Board President addressing the unannounced visits, (C153), Defendants essentially "went after" Plaintiff, a causal chain detailed above that ends with her termination later in the year.

Based on the foregoing, Plaintiff has stated a claim for a *First Amendment* retaliation.

In order to state a claim under § 1983 for retaliatory discharge in violation of the *First Amendment* right to freedom of intimate association a plaintiff must allege (1) an intimate relationship protected by the *First Amendment, see Berrios v. State Univ. of N.Y at Stony Brook*, 518 F. Supp. 2d 409,420 (E.D.N.Y  2007) (marriage protected); (2) an adverse employment action; and (3) evidence that the adverse employment action was motivated in part by the activities of one party to the protected relationship. *See generally Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999); *Agostino v. Simpson*, 2008 U.S. Dist. LEXIS 93094 (S.D.N.Y. 2008) .

Defendants' assert, among other things, that it is fatal to Plaintiff's claim that her husband's speech was not a matter of public concern and is not protected under *Weintraub* (MD28,29) and that to state a valid intimate association claim, Plaintiff must allege that the District's actions must constitute an intrusion into the marital relationship with the likely effect of  ending it. MD29.

First, as a factual matter, Ed Mucci's traditional labor activities, for which courts have uniformly afforded First Amendment protection,[25] go well beyond writing a letter raising the issue of illegal visitations.   *See* C359.  At the pleading stage, these activities, which are an ongoing part of any labor relationship, have been identified and only discovery will reveal which action, among those identified, may have resulted in the actions taken against Plaintiff, a fact that resides exclusively within the knowledge of Defendants. Therefore, whether as a result of the letter or some other union activity, a series of events directed at Plaintiff  led to her termination as detailed above.  C155-56; 359-63.  Plaintiff has alleged the requisite causation. *See Adler,* 185 F. 3d at 45; *Agostino,* 2008 U.S. Dist. LEXIS 93094 at 36-37(citation omitted); *see also Sutton*, 96 F. Supp. 2d at 193 ("If . . . it is proven that 'simple vindictiveness' was defendants' true motive, the First Amendment will have been violated.").

As to whether one must show that the intrusion has the effect of ending the protected relationship, the Second Circuit has answered that question in the negative.  *Adler*, 185 F.3d at 44 (retaliatory dismissal is a sufficient burden on marital relationship to maintain § 1983 action); *Adkins v. Board of Educ*., 982 F.2d 952 (6th Cir. 1993) (same).

Based on the foregoing, Plaintiff has stated a viable claim of retaliation based on the *First Amendment* right to intimate association.

**D.     Plaintiff's Conspiracy Claims**

Plaintiff's Sixth and Seventh claims allege respectively that certain defendants conspired to remove Plaintiff from her position based on her race and gender (Claim 6) and other

---

[25] *Nagle v. Village of Calumet Park*, 554 F.3d 1106 (7th Cir. 2009); *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006).

defendants, failed to prevent the discriminatory acts - including Plaintiff's termination - although aware of the reasons behind the acts. (Claim 7).[26]

To state a cognizable claim under §1985(3), plaintiffs must allege: (1) a conspiracy; (2) for the purpose of depriving a person of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Smith v. Metro North Commuter R.R.*, 2000 U.S. Dist. LEXIS 14168, No. 98 Civ. 2528, 2000 WL 1449865, at 21 (S.D.N.Y. 2000) (*citing Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)).

Defendants do not challenge the existence of a conspiracy,[27] or whether there were overt acts pled in furtherance of the conspiracy. *See, e.g.,* C 365-66 (conspiracy); C368 (overt acts). Nor do defendants challenge the existence of the requisite injury. *See* C268,269. Defendants raise several other challenges to the conspiracy claims. First, Defendants contend that there was no plausible claim of discrimination (MD 31), a contention Plaintiff has refuted, *see supra* pp. 13-16 ( C309-329), and that because the employer has not discriminated, there is no predicate for imposing liability under an aiding and abetting theory, MD 32. Second, Defendants contend that, under the intracorporate conspiracy doctrine, employees of the same entity are legally incapable of conspiring together. *Id.* Finally, raising a related issue, Defendants cite a few cherry-picked allegations and contend that they are insufficient as a matter of law to "show that anyone acted outside the scope of their employment." *Id.*

---

[26] Defendants' sole challenge to the § 1986 claim is that Plaintiff failed to prove discriminatory animus. Plaintiff has adequately pled discriminatory animus. *See supra* 13-16.

[27] A jury is permitted to infer that there was a conspiracy or tacit agreement based on circumstantial evidence alone. *United States v. Santos,* 449 F.3d 93, 103 (2d Cir. 2006).

Citing cases arising out of § 1981, §1983, ADEA, or the New York State Human rights law, Defendants' claim aiding and abetting liability is unavailable where the employer has been not been found to have discriminated.  While this argument and Defendants' citations do not appear to implicate §§ 1985 and 1986 claims, but rather the § 1983 claim, Plaintiff has adequately pled that the employer/District discriminated against Plaintiff.  See supra pp. 13-16.

Similarly, Defendants' attempt to invoke the intracorporate conspiracy doctrine must fail. MD31.  There is a "personal interest" exception to the intracorporate conspiracy doctrine, which permits a § 1985 claim where there are individuals who are motivated by personal reasons independent from the objectives of the enterprise.  *See, e.g., Roniger v. McCall*, 22 F. Supp. 2d 156, 168-69 (S.D.N.Y. 1998) (alleged political motives precluded application of doctrine at pleading stage); *Geiger v. E.I. Dupont Nemours & Co.*, 1997 U.S. Dist. LEXIS 2049 at 27-29 (S.D.N.Y. 1997)(observing that where the defendant possessed independent, personal conspiratorial purposes, a plaintiff may allege that employees within a corporation have conspired among themselves such that the § 1985(3) claim would not be subject to immediate 12(b)(6) dismissal); *Agugliaro v. Brooks Bros., Inc.*, 802 F. Supp. 956, 963 (S.D.N.Y. 1992) (stating that plaintiff may maintain a § 1985 claim against a corporation and its agents where the plaintiff alleges that defendants were acting upon their own motives). For example, where one is acting out of concern for being reelected rather than in the interests of the employer, it has been held that intercorporate or enterprise conspiracy doctrine would not preclude a § 1985 claim. See e.g. *Roniger,*22 F. Supp. 2d at 168-69 (defendant  had personal  stake in being reelected to political office).

While what motivated Board members to act in the manner they did may be ferreted out in discovery, or be left to a jury to divine in a trial of this action, Plaintiff has alleged "that one or

more of the conspirators or others were acting within the scope of their employment while others were acting beyond the statutory scope of their employment, and [their actions] were not taken in the furtherance of the Board or District's interests, but in their own personal interests." C367. As to the Board officials, who stand for reelection periodically, their actions may have been animated by a desire to curry favor with certain minority constituencies. *See* C309-329(Bowles). Others may have acted out of other personal interests, whether it be an interest in advancing the cause of racial balancing in the District, or a personal, but misguided belief, that males are stronger role models. Whatever the personal motivations of the individual conspirators, the common goal as advanced by Ms. Bowles, Mr. DeMarco, Ms. McAfee, and others Board members known only to the Defendants, was the termination of Plaintiff, and as adequately alleged, the ultimate purpose behind her removal was, whether based on an express or tacit agreement between the conspirators, to put a male minority – someone "better suited for the job" (MD20) – in charge of THA.

Based on the foregoing, Plaintiff has sufficiently pled a § 1985 conspiracy claim.

## E.    State Law Claims

### 1.    The Court Should Exercise Supplemental Jurisdiction

Citing 28 U.S.C. § 1367(c)(2), which permits a court to decline to exercise supplemental jurisdiction in circumstances where the pendent claims substantially predominate over the claim or claims over which the court has original jurisdiction, Defendants contend that, inasmuch as they have asserted that the federal causes of action are, in their view, inadequately pled and facially implausible, the Court should decline to exercise supplemental jurisdiction.  MD33. Given the rationale cited in the motion, it appears that the Defendants actually are seeking a

dismissal of the state claims under 1367(c)(3), which allows a court to dismiss pendent state law claims when it has dismissed all claims over which it has original jurisdiction.

"In any civil action of which the district courts have original jurisdiction, [they] shall have supplemental jurisdiction over all other claims that are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy …" 28 U.S.C. § 1367(a).  While the court may decline jurisdiction in four enumerated circumstances, of which Defendants identify only one as a basis for dismissal, that decision is consigned to the sound discretion of the court. *City of Chi. v. Int'l College of Surgeons*, 522 U.S. 156,165 (1997) ("this Court has long adhered to principles of pendent and ancillary jurisdiction by which the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that 'derive from a common nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case'"). (quotations and citations omitted).

Here, Plaintiff has pled a number of federal and state claims arising out of her wrongful discharge and denial of tenure, all arising out of facts and circumstances occurring in the last nine months of a 28-year career, and are therefore inextricably intertwined and are part of the same nucleus of operative facts such that a separate state court action to hear the pendent claims would be redundant in terms of witnesses and evidence, heighten the investment of time and expenses for both parties and result in wasteful and duplicative proceedings in state court. *Id. at* 173 ("a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."); *see also Palmer v. Hospital Authority of Randolph County,* 22 F.3d 1559, 1563-64 (11th Cir. 1994) (district court acted well within its discretion to hear the supplemental claims arising under state law inasmuch as it would

be a substantial waste of judicial resources to separate out the state claims in this action);

*Cabrera v. New York City*, 2004 U.S. Dist. LEXIS 18402 at 28 (S.D.N.Y. 2004) (state law

claims against all defendants and federal claim against city and hospital shared common nucleus

of operative fact, and trying claims together promoted judicial efficiency).

      For example, Defendants cite the state contract claims as not being part of a common

nucleus as the federal claims.  But in order to resolve the federal due process claim, one must

determine whether Plaintiff had acquired tenure by estoppel, a concept arising under state law,

and was therefore entitled to the procedural protections afforded educators by § 3020(a) of the

New York Education Law.  A failure to provide those § 3020(a) protections is the basis of the

federal procedural due process claim.  A subsidiary question that is intertwined with the issue of

whether Plaintiff acquired tenure by estoppel is the validity of the *Juul* Agreement including the

issue of whether it was supported by valid consideration, whether it was procured by fraud or

coercion, or whether the agreement was a product of a knowing and intelligent waiver of a right,

as required by New York law.[28]  Similarly, the numerous violations of state law and District

policy and procedure referenced in the Complaint are suggestive of discriminatory intent and

will be among the evidence that Plaintiff will submit in the trial of this action on the gender and

race discrimination claims under § 1983.  *See Stern v. Trustees of Columbia University in the*

*City of New York*, 131 F.3d 305, 313 (2d Cir. 1997) (if an employer deviates from usual hiring

practice or stated policies, this may support a finding that the employment decision was more

likely than not based on discrimination).

---

[28] These are straightforward matters of New York law, and, rather than being "novel or complex," as defendants suggest, MD 37, the questions have been previously addressed and settled by the appellate courts in New York.  [cite]

Finally, contrary to Defendants' assertion, the federal claims raised are well pled, alleging various violations of the Constitution as applied to a municipality under § 1983 and are not substantially predominated by state claims.  Eight claims arise under federal law; the remaining state claims, and the alleged violations, will be part of the evidence presented in the prosecution of the federal claims or otherwise must be resolved in or to reach the federal questions.  *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 722 (2d Cir. N.Y. 2002).  Rather than being an afterthought, the state claims are inextricably linked to the federal claims and are part of the common nucleus of operative facts implicated by the federal claims.  For those reasons, it is appropriate for the Court to retain jurisdiction over the state law claims.

### 2.    <u>Wrongful Termination</u>

While difficult to discern exactly what Defendants are arguing with respect to the claims mentioned under the wrongful termination heading, *see , e.g.,* Article 78, N.Y. Educ. Law §§ 2509, 3020,[29] 3031, (Claims 11, 14,15,16,17), they appear to be contending that a state law Article 78 claim may not be pleaded as "a federal question," that Plaintiff can be terminated at any time and that the claim under Public Officer's Law § 103 is implausible. MD33

First, with respect to Article 78, such claims can be maintained in federal court, not pursuant to a claim under the court's federal question jurisdiction, but rather as a state law claim over which a court may exercise supplemental jurisdiction pursuant to 28 USC §1367. *See, e.g., City of Chi.,* 522 U.S. at 167  (holding Illinois analog  to Article 78 subject of supplemental jurisdiction);  *Casale v. Metro. Trans. Auth.*, 2005 U.S. Dist. LEXIS 34637at 14-21 (S.D.N.Y. 2005) (indicating that federal jurisdiction could exist over Article 78 claim but remanding case on other grounds); *Kelly v. City of Mt. Vernon*, 344 F. Supp. 2d 395, 406 (S.D.N.Y. 2004)

---

[29] Addressed *supra* pp. 17-24.

(McMahon, J.) ("I could consider the [Article 78] claim if it were pendent to a viable federal claim, but all of Plaintiff's federal claims have been dismissed").[30]

Disposing of the question of whether the court's supplemental jurisdiction reaches an Article 78 claim is the Supreme Court's holding in *City of Chi.*, 522 U.S. at 167.  There, the Court considered whether a federal court could exercise supplemental jurisdiction over state law claims challenging state administrative actions where they were appended to claims presenting federal questions.   The Court held, after determining there existed claims over which the court had federal question jurisdiction:

> [T]he relevant inquiry respecting the accompanying state claims is whether they fall within a district court's supplemental jurisdiction, not its original jurisdiction. And that inquiry turns, as we have discussed, on whether the state law claims "are so related to [the federal] claims . . . that they form part of the same case or controversy." § 1367(a)

*Id.* at 167.  The Court specifically rejected the contention that a federal court could not exercise supplemental jurisdiction over a claim arising under the Illinoise Administrative Review Law, an Illinois analog of Article 78:

> There is nothing in the text of § 1367(a) that indicates an exception to supplemental jurisdiction for claims that require on-the-record review of a state or local administrative determination. Instead, the statute generally confers supplemental jurisdiction over "all other claims" in the same case or controversy as a federal question, without reference to the nature of review. Congress could of course establish an exception to supplemental jurisdiction for claims requiring deferential review of state administrative decisions, but the statute, as written, bears no such construction.

*Id.* at 169. Therefore, despite a preponderance of local authority that suggests otherwise, the Court surely can exercise its discretion to consider an Article 78 claim.  Here, it makes

---

[30] *Cf.  Cartagena v. City of New York*, 345 F. Supp. 2d 414, 426 (S.D.N.Y. 2004) (accepting supplemental jurisdiction after defendants withdrew their jurisdictional objection and "unequivocally agreed, in the unusual circumstances of th[e] case, to the submission of the Article 78 claim" to the federal court).

particularly good sense because the claim is inextricably interwoven in the same set of facts that gives rise to the federal claims and, not exercising jurisdiction, would result in duplicative litigation, and additional burdens for the parties and the witnesses to participate in a separate state court action.

Plaintiff's Education Law claims §§ 2509 and 3031, rather than being addressed by Defendants' claim that Plaintiff was somehow unqualified for the job, require that certain process be afforded Plaintiff, which Plaintiff alleges was not done.  C422,428,435,441.  Under § 2509, Plaintiff was entitled to notice 60 days in advance of her three-year anniversary or tenure date, and the District failed to fulfill that requirement.  More significantly, the power to recommend tenure is vested solely in the Superintendent and requires that those found "competent, efficient and satisfactory" be recommended for tenure by the Superintendent in a writing to the Board.  Educ. Law § 2509(1)(b) & (2).  Again, even though the evaluations and observations of Plaintiff reflected that Plaintiff was competent and was in fact recommended for tenure by the Assistant Superintendent of the District, the Superintendent failed to perform the obligation enjoined upon her by law, and deferred to the unlawful imposition foisted on her by the Board instead of reaching her own lawful determination.   C297-98.

As to § 3031, no later than October 14, 2009, at a Board meeting that was posted on the District's website, and was actually conducted but for which no minutes were prepared, or perhaps as early as Spring 2009, the District concluded that Plaintiff would be denied tenure and would be terminated.  C260-261. Whether the decision to deny tenure was made in the Spring or at the October 14 meeting, Plaintiff was not given the requisite notice under Educ Law § 3031, which requires 30 days advance notice of a meeting where a recommendation not to award tenure is going to be considered and an opportunity to learn of the reason for the

recommendation and to submit a written response.  Plaintiff was not given notice or an opportunity to respond prior to her tenure being effectively denied by her termination, preventing those Board members who were not improperly motivated, to learn the true state of facts and resolve the decision in favor of Plaintiff, or at least vote in dissent.

Finally, Plaintiff has alleged a violation of Public Officers Law § 103, the so-called Open Meeting Law, which requires the District to transact business, including informal discussions and any activity preliminary to a vote, at a duly convened meeting.  Discussions and deliberations, including those about Plaintiff's tenure, *Juul* Agreement and termination, were held in advance of the meeting in which they were the subject of a formal vote, violating §103.  C449,450.

### 3.    <u>Intentional Infliction of Emotional Distress</u>

Although Plaintiff  has sufficiently pled the intentional infliction of emotional distress claim to survive a motion to dismiss, *see Sullivan v. Board of Education,* 131 A.D.2d 836 (2nd Dep't. 1987),  Plaintiff has authorized the withdrawal of this claim.

### 4.    <u>Defamation</u>

Defendants contend that Plaintiff has failed to identify the time and manner of the publication, that the termination letter was not "published," as that term is construed pursuant to the common law of defamation, that the reasons for termination were true, that the information about the EIP ultimately proved true, and that the allegations are based on hearsay[31], and that the defamation question is immaterial to the federal question and does not warrant supplemental jurisdiction, an issue Plaintiff addresses above, *see* pp. 32-34. MD at 38-39.

"Under New York law, the elements of a defamation claim are a false statement, published without privilege or authorization to a third party, constituting fault . . . and it must

---

[31] While evidentiary issues will ultimately ruled upon at trial, the allegations would fall into one of the exceptions for hearsay.  See p. 8 n.6.

either cause special harm or constitute defamation per se." *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003) (quotations omitted). "[P]laintiff sufficiently stated a claim of libel per se where the defendant attributed to him specific acts suggesting the plaintiff's unfitness for his professional role" *see Chiavarelli v Williams*, 256 AD2d 111, 113 (1st Dep't. 1998); *Public Relations Soc'y of Am., Inc. v. Road Runner High Speed Online*, 799 N.Y.S.2d 847, 852 (N.Y. Sup. 2005).

Plaintiff alleges that she was defamed by one or more District official's defamatory statements about Plaintiff. First, in the Spring of 2009, various employees in the school, who had no reason to know of personnel actions against plaintiff, said that they were told by "reliable" or "credible" sources in the District that Plaintiff would be denied tenure and terminated. C189-195. At the time those statements were made, they were indisputably false, and inasmuch as the District lacked any cause to deny tenure or terminate Plaintiff even under their own view of the case until September 2009, the statements were disseminated with malice, in order to discredit her in her profession, and to diminish her in the eyes of all those in the District, including those she supervised. C195. Second, on or about October 20, 2009, the District, through Dr. Saturnelli, announced her recommendation for Plaintiff's termination, communicating that to, among others, the health office of the District. Ex. H to MD. Later, when asked for the reasons for the termination, Dr. Saturnelli and others fabricated the pretextual reasons for terminating Plaintiff and detailed those false reasons in a letter to Plaintiff. The reasons were false when published and, when coupled with the publication of her termination had the effect of suggesting that Plaintiff was incompetent and had performed unsatisfactorily, when such inferences were false and at odds with the Plaintiff's true record of performance. C119-140. The statements had the effect of diminishing her professional reputation and were

published to others within the District who had no valid reason to be made aware of those statements. C189-195.  Upon the inquiry of each future prospective employer or professional colleague, these defamatory statements have and will be published.

For those reasons, Plaintiff has adequately pled a defamation claim.

F.      **Defenses: Qualified Immunity and Municipal Liability**

Defendants raise two defenses in their motion.  First, Defendants assert they are entitled to qualified immunity. Their acts, they contend, were objectively reasonable, pursuant to lawful procedures as prescribed by Education Law, were not based on any impermissible reason and that Plaintiff was discharged due to administrative performance issues. MD40. Their second defense is that the District as a defendant is protected by the *Monell* doctrine.

A government actor is entitled to immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist*., 239 F.3d 246, 250 (2d Cir. 2001).  The threshold question is whether a favorable view of the Plaintiff's alleged facts shows that the official's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201, (2001).   Here, as amply demonstrated above, Plaintiff has alleged that, in effecting her removal and termination, Defendants violated her constitutional rights by taking adverse actions based on a discriminatory animus, *supra* pp. 13-16.

Defendants assert only that their actions were objectively reasonable; they do not dispute that any of the rights implicated in this action were not clearly established. MD40.[32]  At this juncture, the reasonableness of their actions for the purposes of establishing qualified immunity cannot be decided:

---

[32] And it is likely they cannot given the well settled case law in the area and their own personal involvement in other published § 1983 cases.

> [J]udgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law.

*O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003); *Valenti v. Massapequa Union Free Sch. Dist.*, 2010 U.S. Dist. LEXIS 10076 at 31-33 (E.D.N.Y. 2010) (qualified immunity defense denied at the motion to dismiss stage because the record did not provide a sufficient basis for the Court to make a determination).

Defendants also assert that Plaintiff has failed to state a valid claim of municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). MD40,41.  Defendants' primary contention appears to be that there is not a predicate constitutional violation to establish *Monell* liability, that a single act (which is not the case here) is insufficient to form Monell liability, and that unspecified allegations are conclusory.

"The Supreme Court has identified at least two situations that constitute a municipal policy: (1) where there is an officially promulgated policy as that term is generally understood and (2) where a <u>single act</u> , *compare MD at 41,* is taken by a municipal employee who, as a matter of State law, has final policymaking authority in the area in which the action was taken." *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008)(emphasis added).

However, both municipal policies <u>and</u> municipal customs can be grounds for finding municipal liability.  *Monell*, 436 U.S. at 690.  To state a claim based on a municipal custom, a plaintiff must show that the custom is well-settled or of such widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a custom or usage with the force of law." *Kubicek v. Westchester County*, 2009 U.S. Dist. LEXIS 117061 at 32 (S.D.N.Y. 2009)  (citations and quotations omitted).

As detailed *supra* at pp. 13-16, Plaintiff has amply alleged detailed facts supporting the existence of unconstitutional policies (C263,309-329,336,378-384) and the many instances in which they were applied to her. *Id.* The Plaintiff has also alleged actions by policymakers, i.e., Board members and the Superintendent, to demonstrate the existence of a policy. Plaintiff has also alleged acts constituting a *Monell* claim, including the application of different sets of standards for minority and non-minorty administrators, and taking adverse employment actions against non-minority administrators. Given the repeated nature of their application over a multi-year period going back to at least 2006 (C309,313,314,317,322,324,326,328,336,381) by established committees of the Board, consisting of policymakers and nonpolicymakers, including Human Resources personnel, and individual Board members and other employees, those practices had become custom and practice of the District. C309-329, 308,317,322,323,336,378-384.

Plaintiff has sufficiently pled the existence of an unconstitutional custom under *Monell*.

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: December 8, 2010
New York, New York

Respectfully submitted,

**MICHAEL T. MURRAY & ASSOC., P.C.**

By:  s/Michael T. Murray
Michael T. Murray (MTM5032)
John T. Murray (JTM0465)
10 Esquire Road, Suite 11C
New City, New York 10956